UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANNIE V. BUNNS<br>Plaintiff, | : | |
| v. | : | Civil Action No.<br>3:05-cv-29 (JCH) |
| EATON CORPORATION<br>Defendant. | : | DECEMBER 1, 2006 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 44]**

The plaintiff, Annie V. Bunns, brings this action against the defendant, Eaton Corporation, under Section 510 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, for its alleged interference with her continuing rights under an Eaton long-term disability plan. The jurisdiction of this court allegedly arises under 29 U.S.C. §§ 1132 and 28 U.S.C. §§ 1331, and 1343(a) (4). Bunns also requests that this court exercise jurisdiction over her pending state claims.

Eaton brings this Motion for Summary Judgment (Doc. No. 44) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Eaton's motion is GRANTED.

## I. SUMMARY JUDGMENT STANDARD

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion.

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II. BACKGROUND[1]

### A. Parties

Bunns, currently a resident of Bethel, North Carolina, was a Danbury, Connecticut resident during the events giving rise to this action. Beginning on May 6, 1997 and at all relevant times, Bunns was employed by Eaton. Eaton is a corporation formed and existing under the laws of Ohio, with a place of business in Bethel, Connecticut. Eaton is an employer engaged in an industry or activity affecting commerce within the meaning of 29 U.S.C. § 1002(5) and (12). In addition, Eaton is both the “plan sponsor” and the “plan administrator” of the Eaton Corporation Employee Benefits Plan (the “Plan) within the meaning of 29 U.S.C. §§ 1002(16) (A) and (B), respectively. The Plan, which governs long-term disabilities for active U.S. employees

---

[1]For the purposes of the instant motion, the court accepts as true facts undisputed by the parties and resolves disputed facts in favor of Eaton where she provides evidence to support her allegations.

and non-bargaining hourly employees, is an employee benefits plan under 29 U.S.C. § 1002(3).

**B.     Facts**

In June 1998, Bunns became disabled from her work at Eaton as a mechanical assembler and production/test operator by rheumatoid arthritis.  Beginning on June 12, 1998, Bunns received short-term disability benefits, until she qualified for long-term disability benefits under the first tier of the Plan on December 9, 1998.  Effective June 12, 2000 and continuing through February 28, 2004, Bunns received long-term disability under the second tier of the Plan.  The second tier of the plan states that an employee has a "covered disability" if the employee is:

> totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which [she is], or may become, reasonably well-fitted by reason of education, training or experience - at Eaton Corporation or elsewhere.

Eaton Summary Plan Description, Ex. A. to Memo in Support at 32 (Doc. 45).  Under the Plan, Eaton has sole discretion to determine the availability and suitability of alternative positions at Eaton.  Id.  The Plan also mandates periodic investigations into the beneficiary's disability status, which investigation may include collecting updated medical information, independent medical examinations, and/or functional capacity tests.  Id. at 37.

From 2001 through 2003, Broadspire, Eaton's third party administrator for disability claims, periodically requested that Bunns' treating physician, Dr. Chmelewski, complete an "Attending Physician's Statement" to provide information regarding the Bunns' treatment.  Dr. Chmelewski submitted one form to Eaton dated November 20,

2001, and another dated December 23, 2002.  Additionally, Dr. Chmelewski submitted an "Estimated Physical Abilities" Form to Eaton dated March 7, 2003.  Also in connection with Eaton's ongoing evaluation of Bunns' physical condition, Eaton solicited from independent doctors, a "General Peer Review" on October 2, 2003; a "Functional Capacity Evaluation" dated November 6, 2003; an "Employability Assessment Report" dated December 17, 2003; and a "Labor Market Survey" dated January 12, 2004.

      Based on the documentation listed in the preceding paragraph, Broadspire advised Bunns on January 30, 2004 that she no longer qualified for long-term disability coverage under the Plan because she was capable of performing sedentary work within reasonable restrictions.  The Employability Assessment Report and Labor Market Survey listed a number of available positions for which Broadspire determined that Bunns was qualified and physically capable of performing.  Pursuant to Broadspire's finding, Bunns' long-term disability benefits were terminated on March 1, 2004.

      With a letter dated February 23, 2004, Bunns made an initial appeal to Broadspire of the denial of her benefits.  Bunns supported her appeal with a December 2, 2003 letter from Dr. Chmelewski, March 15 office notes from Chelewski, and an April 14, 2004 disability letter from Dr. Panos Fourtounis.  In reviewing Bunns' appeal, Broadspire retained an independent rheumatology specialist and engaged three independent physicians to conduct peer reviews in the areas of psychiatry, obstetrics/gynecology, and neurology.  By letter dated June 24, 2004, Broadspire rejected Bunns' appeal, concluding that there was "a lack of medical evidence revealing a functional impairment that would preclude [Bunns] from performing the work in any occupation."  Ex. A to Memo in Support at 210.

Following this denial, Bunns pursued a second level appeal to Eaton via a letter dated February 11, 2005. Because Bunns' appeal came more than 180 days after her receipt of the denial determination, Eaton rejected the application as untimely. Bunns then filed this action on April 22, 2005. (Doc. No. 5.) On July 26, 2005, this court entered a consented to stay to suspend the action until Eaton, as Plan Administrator, reviewed Bunns' claim and rendered a final benefit determination.

In its review of Bunns' benefit claims, Eaton reviewed two additional General Peer Reviews obtained by Broadspire subsequent to Bunns' February 11, 2005 appeal letter. Eaton also solicited another independent physician to review Bunns' file. Thereafter, Eaton concluded that Bunns "[had] not provided objective findings sufficient to establish that she is totally and continuously unable to perform any occupation." Ex. A. at 64. Eaton therefore denied Bunns' long-term disability benefits. Id.

## III. DISCUSSION

### A. ERISA STANDARD OF REVIEW

A challenge to the denial of benefits under section 502(a)(1)(B) is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If an employee benefits plan gives the plan administrator discretion to determine eligibility for benefits or to interpret the plan's terms, a reviewing court should generally review the administrator's decision using the "arbitrary and capricious standard." See Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995). Under this standard of review,

a court may overturn an administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 442. In other words, an administrator's interpretation of a plan "'will not be disturbed if reasonable.'" Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1255 (2d Cir. 1996) (quoting Firestone, 489 U.S. at 111). This is true even if the plan administrator is operating under a conflict of interest, although such a "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 115 (citation omitted).

The long-term disability plan at issue states as follows:

> The Plan Administrator and/or Claims Administrator has discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including, but not limited to, any disputed or doubtful terms. The Plan Administrator and/or Claims Administrator also has the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan. Any and all determinations by the Plan Administrator and/or the Claims Administrator will be conclusive and binding on all persons, except to the extent reviewable by a court with jurisdiction under ERISA after giving effect to the time limits described in the "Claims Appeal Procedure" section of this booklet.

LTD Summary Plan Description, Ex. A at 47. In moving for summary judgment, Eaton claims that this language grants the Plan Administrator discretionary authority to determine eligibility for benefits, thus warranting an arbitrary and capricious review by this court. Bunns does not dispute that the Plan unequivocally provides discretionary authority to the Plan Administrator. Mem. in Opp. at 5. Instead, relying on this court's decision in Peck v. Aetna Life Insurance Co., 2005 WL 1683491 (D.Conn. 2005), Bunns argues for a *de novo* standard of review on the ground that the language governing second-tier eligibility is clear and unambiguous. In the alternative, Bunns

contends that a *de novo* standard of review is appropriate because Eaton's interpretation of the Plan was influenced by an inherent conflict of interest. The court rejects both assertions.

1. Impact on the Second-Tier's Language on the Standard of Review

In Peck, this court ruled that, "if the plan's language is clear and unambiguous, *de novo* review is appropriate because unambiguous language leaves no room for the exercise of discretion." Peck v. Aetna Life Insurance Co., 2005 WL 1683491 at 4. According to Bunns, the Plan's guidelines for determining eligibility under the second tier are clear and undisputed, leaving the Plan Administrator with no room to interpret its terms. However, the instant case involves a question of Bunns' eligibility under the second tier, not the Plan Administrator's interpretation of the second tier's language. Peck is therefore inapposite. There is no question that the Plan grants the Plan Administrator discretion to determine an employee's eligibility under its terms.

2. Eaton's Conflict of Interest as Plan Administrator

In Sullivan, the Second Circuit created a two-part "test for determining whether the administrator's interpretation of [a] plan is arbitrary and capricious" where a plan administrator is "shown to have a conflict of interest." 82 F.3d at 1255. This test applies even where, as Bunns alleges, there is an inherent conflict of interest between the company's fiduciary duty as plan administrator and its profit making objectives as a competitive business who must pay benefits under the plan. Id. First, the court must decide whether the "determination made by the administrator is reasonable, in light of possible competing interpretations of the plan." Id. Second, the court must determine if "the evidence shows that the administrator was in fact influenced by such conflict." Id.

at 1255-56. If so, "the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo*." Id. at 1256.

Under the first part of Sullivan's conflict of interest test, Bunns argues that the Plan Administrator's determination was unreasonable because she was clearly not qualified for any of the three positions listed in the Functional Capacity Evaluation ("FCR") and Employability Assessment Report ("EAR").[2] These three positions were Collection Clerk, Information Clerk, and Telephone Solicitor. With regards to each position, the EAR states that Bunns did not have a high enough GED level and lacked certain necessary skills needed to perform the position. Ex. A at 253-261. Bunns also relies on the fact that Dr. Chmelewski, in his Attending Physician's Statement, stated that Bunns was not a suitable candidate for vocational rehabilitation because of her ongoing pain and anxiety. Therefore, not only does she claim that she was not qualified for these positions, but she also claims that she could not become qualified for them due to her rehabilitation limitations.

The court finds that Bunns has not put forward sufficient evidence to show that Eaton's denial of her long-term disability benefits was unreasonable. For one, Bunns never addresses her eligibility for the numerous positions listed in the Labor Market Survey, which was also a part of her Administrative Record. Second, the only ways in which Bunns directly impugns the conclusion of the eight independent doctors who reviewed her file is by noting that either Eaton or Broadspire selected these doctors and

[2] Bunns also argues that Eaton's findings are unreasonable because "there is only one reasonable interpretation of the plan language involved in this case." Mem. in Opp. at 14. As the court has already stated, the issue here is not how to interpret benefits eligibility under the plan's second tier, but how the plan applies to Bunns' particular case.

by pointing out that the doctors' opinions conflicted with Dr. Chmelewski's opinion. Bunns does not present any deficiency within the doctors' analyses that would impeach their findings, nor does she otherwise provide a basis for concluding that it would be unreasonable to not accept Dr. Chmelewski in favor of the eight uniform and contrary opinions.

Thus, despite Eaton's inherent conflict of interest as both Bunns' employer and the plan administrator, the court concludes that Eaton's ultimate decision denying Bunns' long-term disability benefits was reasonable in light of Bunns' competing interpretation that she still qualified.

Next, the court addresses whether Eaton's conflict of interest actually affected its final decision. This is because, even if Eaton's ultimate decision was reasonable, a *de novo* review would still be appropriate if Bunns can show that Eaton chose this reasonable application of the Plan over hers due to a conflict of interest. See Sullivan 82 F.3d at 1255 (reasoning that the arbitrary and capricious standard should apply when considering a potential conflict of interest "unless the conflict affected the choice of a reasonable interpretation.") To this end, Bunns advances a host of arguments to establish that Eaton was affected by its conflict of interest. She contends that the forms Eaton requested that Dr. Chmelewski complete in regards to Bunns' evaluation were skewed to prevent reviewers from submitting information inconsistent with the denial of long-term disability benefits; that Eaton never communicated to Chmelewski the fact that Bunns' ability to receive benefits was "on the line," thus preventing him from accurately advocating for her best interests in filling out Eaton's forms; and that Eaton's retention of eight independent examiners was suspicious considering its consistent view

that Bunns' own evidence did not establish disability.  Mem. in Opp. at 15.

The court finds that none of Bunns' arguments creates a material issue of fact as to whether Eaton operated under an actual conflict of interest in reviewing her benefits eligibility.  Taking her last point first, Bunns appears to posit that, once Eaton determined that Bunns' own evidence did not establish disability, its solicitation of additional opinions bolstering this conclusion lacks credibility to the extent it was unnecessary.  Once again, Bunns stops short of arguing that the independent reviewers' conclusions were wrong or unduly influenced by their relationship with Eaton.  Thus, on Bunns' suggestion alone, the court cannot discern a nefarious motive in Eaton's actions.

Equally flawed is Bunns' suggestion that Eaton should have placed Dr. Chmelewski on notice that her benefits were "on the line" so that Dr. Chmelewski could advocate more accurately on her behalf.  The administrative record shows that Dr. Chmelewski was indeed on notice that his evaluations were being considered as part of Bunns' evaluation for some form of disability benefits.  The Attending Physician's Statements that Dr. Chmelewksi filled out clearly state that "[t]he purpose of this statement is to assist the claims administrator, Kemper, in making a determination of disability for [Bunns]."  E.g. Attending Physician's Statement, Dec. 23, 2002 (Ex. A at 343) (classifying Bunns as "marked limitation of functional capacity/capable of sedentary work").  Similarly, the Estimated Physical Abilities form Dr. Chmelewski completed clearly lists that it is from an insurance company and asks the evaluator to "complete the following items based on your estimated clinical evaluation regarding the disability you are currently treating [Bunns] for."  Estimated Physical Abilities Form,

March 7, 2003 (Ex. A at 349) (finding that, if Bunns was capable of sedentary work, it would only be for two to four hours per day). In her one sentence argument on this point, Mem. in Opp. at 15, Bunns cites to no authority obligating Eaton to be more explicit about the purpose of these forms,

Lastly, the court is also not persuaded by Bunns' contention that Eaton designed its benefits determination forms to prevent physicians from accurately describing their views on a patient's ability to hold employment. The Attending Physician's Statements forms are deficient in Bunns' view because they only allowed Dr. Chmelewski to indicate Bunns' level of physical impairment as "Class 4. Marked limitation of functional capacity/capable of sedentary work," rather than "marked limitation of functional capacity" and "incapable of sedentary work." Mem. in Opp. at 9. Bunns also asserts that these forms did not permit Dr. Chmelewski to provide an individualized assessment of Bunns' employment potential. As for the Estimated Physical Abilities, Bunns argues that these forms were also skewed because the classifications offered prevented Dr. Chmelewski from opining fully on Bunns employment capacity. Yet, nowhere in her submissions does Bunns provide a basis for concluding that the format of Eaton's forms are objectionable in light of her preference for how the forms should have been crafted. Nor does Bunns explain what about the forms prevented Dr. Chmelewski from supplementing the forms with additional written comments or additional documents more accurately representing his view of Bunns' condition.

Because the court finds no reason to conclude that Eaton's final determination was either unreasonable or actually motivated by a conflict of interest, the court will examine Eaton's determination using an arbitrary and capricious standard.

**B. Review Under the Arbitrary and Capricious Standard**

Bunns argues that, even under an arbitrary and capricious standard, it cannot be stated as a matter of law that Eaton's denial of her long-term disability benefits was not arbitrary and capricious. The court does not agree. The core of Bunns's argument appears to be that the forms upon which Dr. Chmelewski detailed his conclusions were designed by Eaton to limit the information that could be reported; that Eaton never sought clarification of certain statements by Dr. Chmelewski indicating that Bunns was not in fact capable of sedentary work, and that Bunns was not qualified for the positions listed in the EAR.

None of these submissions creates a material issue of fact as to whether Eaton's decision amounted to an abuse of discretion. As stated above, Eaton never acknowledges the fact that the Labor Market Survey listed jobs for which Bunns qualified that were not mentioned in the EAR. Also as mentioned above, Bunns never directly attacks the review conducted by the eight doctors who concluded that Bunns was capable of sedentary work. Bunns does attempt to impeach the doctors' conclusions by noting that all but one of the peer reviews included in Eaton's final review were obtained after Broadspire determined that Bunns had not submitted objective medical evidence proving her disability in her first level appeal. The implication, never explicitly stated by Bunns, appears to be that Broadspire and Eaton knew all along that she was actually disabled, yet selected independent peer reviewers to build its case for denying her benefits. Beyond this bald assertion, however, Bunns does not cite to one specific deficiency in any of the peer reviews, except to say that their conclusions conflicted with her doctors' determinations.

The court finds Bunns' reliance on Dr. Chmelewski's conclusions to impeach Eaton's peer reviews to be weak given the fact that Dr. Chmelewski submitted opinions about Bunns' physical condition and work capabilities that were at least consistent with Eaton's final denial of benefits.  Though Bunns quarrels with the format of the November 30, 2001 and December 23, 2002 Attending Physician's Statements, in both, Dr. Chmelewski marked Bunns as "Class 4.  Marked limitation of functional capacity/capable of sedentary work," instead of "Class 5.  Severe limitation of functional capacity/incapable of sedentary work."  (Ex. A at 334, 343.)  Also, though Dr. Chmelewski's Estimated Physical Abilities Statement does express what could fairly be characterized as doubt with regards to Bunns' ability to work even two to four hours in a sedentary occupation, it also lists a number of physical activities which Bunns could perform and additionally states that she could sit for eight hours a day, stand for one to two hours a day, and walk for one hour a day.  (Ex. A at 349-50.)  Perhaps most significantly, Dr. Chmelewski presented Eaton with office notes dated March 14, 2004 which stated, "about the ability or not to work, she is not truly disabled from her [rheumatoid arthritis] . . . but there is [sic] certainly a lot of subjective pains."  (Ex. A at 354.)  Thus, while Dr. Chmelewski may have truly believed that Bunns' physical condition should have qualified her for long-term disability benefits, the evidence upon which he based such a conclusion is far from unambiguous.

Viewing the record as a whole, the court finds that Bunns has failed to put forward sufficient evidence to create a material issue of fact as to whether Eaton's denial of her long-term disability benefits was arbitrary and capricious.  As such, Eaton's Motion for Summary Judgment is granted.

## IV. CONCLUSION

For the foregoing reasons, Eaton's Motion for Summary Judgment (Doc. No. 44) is GRANTED. The clerk is hereby directed to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 1st day of December, 2006.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge